The GEORGIA GAZETTE PUBLISHING COMPANY, Plaintiff,

v.

The UNITED STATES DEPARTMENT OF DEFENSE; Caspar Weinberger, Secretary of Defense; and Maj. Gen. John R. Galvin, Commanding General, Fort Stewart, Georgia, Defendants,

Morris Newspaper Corporation, Intervenor.

No. CV483–002.

United States District Court, S.D. Georgia, Savannah Division.

April 11, 1983.

---

James E. Stephenson, Smith, Currie & Hancock, Atlanta, Ga., for plaintiff.

Melissa S. Mundell, Asst. U.S. Atty., Savannah, Ga., for defendants.

Brent Savage, Adams, Gardner, Ellis & Inglesby, Savannah, Ga., for intervenor.

## ORDER

EDENFIELD, District Judge.

### I. Background

Plaintiff, The Georgia Gazette Publishing Company (Gazette), asks the Court to enjoin further performance of a contract for the publication of a civilian enterprise newspaper at Fort Stewart, Georgia. Plaintiff bid for, but was not awarded, the contract to publish the civilian enterprise newspaper called "The Patriot". Now plaintiff complains of constitutional infractions resulting from the Department of the Army's alleged failure to follow its own regulations. The Gazette requests that the Court halt the performance of the contract by the successful bidder, the Coastal Courier (Courier), and order the Department to reevaluate the bids submitted.

### II. The Facts

This Court's Order of January 17, 1983, set forth the relevant facts concerning the solicitation of bids and the contents of the bid the Gazette submitted. Other bidders included Wen San Publishing Company (Wen San) and MNC of Hinesville, Inc. MNC publishes the Coastal Courier, the newspaper which was awarded the contract. After the first hearing on January 7, 1983, the aforementioned Order of this Court allowed the plaintiffs some limited discovery in order that the merits of this case could be discussed. After a brief hearing on the results of the discovery, the parties were requested to submit summations of their arguments and evidence by way of briefs to the Court. Copies of depositions were also filed for the Court's consideration. Based on the preceding information, the Court has adduced the following facts.

1. Major John J. McNeill, Public Affairs Officer for Ft. Stewart/Hunter Army Airfield and the 24th Division at Ft. Stewart coordinated Ft. Stewart's conversion from an Army Authorized to a Civilian Enterprise newspaper. This process began in May, 1982 and culminated in the selection of the Coastal Courier in November, 1982 as the publisher of the Patriot.

2. Major McNeill recommended that a panel be established to review the procedure for the establishment of a civilian enterprise publication and to solicit and evaluate bids. Major McNeill's recommendation to form a panel was based upon his knowledge of the operation of such ventures at two other military installations. At the other installations, the evaluation panels are composed of members of the Public Affairs Office exclusively. Major McNeill recommended that Fort Stewart's panel be composed of members of five different offices and he specifically appointed one member of the Public Affairs Office to the panel because of his experience in newspaper publication. The panel was composed of the following individuals representing their respective offices:

1) Mr. Verlin Boram—Office of the Comptroller;

2) Mrs. Gwen Strickland—a contract negotiator for the Director of Industrial Operations;

3) First Lieutenant Samuel LaCombe— Office of the Adjutant General;

4) Lieutenant Sherrill—Office of the Director of Community Activity and Services;

5) Sergeant Richard Olson—Public Affairs Office.[1]

Major McNeill testified that the diverse panel was selected because "he wanted as much advice as possible [from] across the whole installation." (Tr. at 13).

3. It is not controverted that, had he wanted to, Major McNeill could have recommended the recipient of the license agreement to the Commander without the use of a panel. He testified that, had the choice been his alone, he would have recommended Wen San to the Commander.

4. On October 29, 1982, those publishers who expressed an interest in bidding were informed by the Department of the Army that: "A panel composed of members from several different post activities will evaluate all proposals and determine the one that offers us the best overall package for producing the newspaper."

5. The panel met on November 16, 1982, to select the recipient of the license agreement. The five individuals previously enumerated were present along with Mr. Licatovich and Mr. Sexton. Licatovich and Sexton are both civilian employees in the Public Affairs Office at Ft. Stewart and had experience in publication matters. They were not voting members of the panel but they did answer questions from its members. Major McNeill also attended the meeting but he arrived approximately 45 minutes after it began.

6. At the meeting, each member of the panel was given a worksheet entitled "Evaluation Factors and Values". Organized in a grid format, three major categories were designated with subdivisions listed under each. The three major categories were: (1) Service; (2) Technical; and (3) Management. A fourth category without subdivisions was denominated as "Other Services/Factors". A maximum point value was assigned each subdivision. The panel members were apparently to assign a point value to each subdivision for each proposal.

7. After the worksheets had been completed, an informal verbal poll was taken of the panel in which a clear winner was not identified. The Coastal Courier received the highest number of points from the panel. On November 22, 1982, Major McNeill notified DIC, Chief of Staff that the panel had convened and recommended the Coastal Courier for receipt of the license agreement. Major McNeill referenced Tab D which contained the "compilation of the point values used to determine the best offer."

III. Court's Analysis

■ Plaintiff has asked this Court to reconsider its earlier statement that the standard set forth in *Kinnett Dairies, Inc. v. Farrow,* 580 F.2d 1260, 1261 (5th Cir.1978) would be applied to the instant facts. Plaintiff asserts a "well-recognized distinction between substantive and procedural review of agency action" citing Note, "Judicial Review of Agency Rule-Making," 14 *Ga.L.Rev.* 300 (1980). This Note discusses the Supreme Court's decision in *Vt. Yankee Nuclear Power v. Natural Res. D.C.,* 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978) in which the court held that "Absent constitutional constraints or extremely compelling circumstances the 'administrative agencies "should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties." ' " *Id.* at 543, 98 S.Ct. at 1211, *citing FCC v. Schreiber,* 381 U.S. 279, 290, 85 S.Ct. 1459, 1467, 14 L.Ed.2d 383 (1965). It is significant that the *Vermont Yankee* case and the Note are both concerned with agency rulemaking which, in this Court's view, is not comparable to the situation at hand. The panel formed by Major McNeill to evaluate the proposals was nothing more than an *ad hoc* group whose presence was not mandated by either the CFR provision or applicable Army regulations. However, the panel was used in evaluating the proposal and its presence cannot be ignored. Because I do not find plaintiff's arguments concerning substantive and procedural review apropos to the instant facts, I will use the standard

---

**1.** Sgt. Olson was the individual Major McNeill specifically appointed to the panel.

enunciated in *Kinnett Dairies* as stated in the earlier Order.

■ The requirements of issuance of a preliminary injunction are clear in this Circuit and the plaintiff has the burden of showing all four. *Shatel Corp. v. Mao Ta Lumber and Yacht Corp.,* 697 F.2d 1352 (11th Cir.1983); *Canal Authority of the State of Florida v. Callaway,* 489 F.2d 567 (5th Cir.1974). These requirements are: (1) substantial likelihood that plaintiff will prevail on the merits; (2) the existence of a substantial threat that plaintiff will suffer an irreparable injury if the injunction is *not* granted; (3) the threatened injury to plaintiff outweighs the threatened harm that the injunction will cause the defendant; (4) that the granting of the injunction will not disserve the public interest. Because a preliminary injunction is an extraordinary and drastic remedy, its grant is the exception rather than the rule, and plaintiff must clearly carry the burden of persuasion. *United States v. Lambert,* 695 F.2d 536 (11th Cir.1983).

■ The evidence presented for each of those criteria is balanced by the court on a sliding scale analysis: a much stronger showing on one or more of the necessary factors lessens the amount of proof required for the remaining factors. *Collins & Co., General Contractors v. Claytor,* 476 F.Supp. 407, 409 (N.D.Ga.1979).

### A. *Gazette's Likelihood of Prevailing on the Merits*

■ The Gazette's argument on the merits can be paraphrased as follows: As evidenced by Major McNeill's memorandum dated November 22, 1982, paragraph 3, the point values assigned by the panel were used to determine the best offer for the award of the civilian enterprise newspaper license. However, the relative point values assigned by the panel to various items on each bidder's proposal defy reason. Furthermore, the Gazette notes that the applicable regulation, CFR § 202.11(b)(1) requires that:

In selecting a civilian enterprise publication for distribution, fair and equal op-

portunity will be afforded any responsible bidder who may wish to submit a proposal to publish such a publication.

Therefore, the Gazette's contention is not that the decision-making *process* employed in this case is *per se* irrational or in violation of *required* procedures. To the contrary, the Gazette's contention is that the process as implemented produced an irrational decision, one that was in violation of the regulation requiring that bidders be treated fairly and equally.

Considering this argument and the evidence in conjunction with the standard set forth in *Kinnett Dairies,* I am persuaded that the Gazette has shown a substantial likelihood of prevailing on the merits. To reiterate, *Kinnett Dairies* requires that the plaintiff challenging procurement decisions:

bear(s) a heavy burden of showing either that (1) the procurement official's decisions on matters committed primarily to his own discretion had no rational basis, or (2) the procurement procedure involved a clear and prejudicial violation of applicable statutes or regulations.

580 F.2d 1260, 1271 (5th Cir.1978), *quoting Kentron Hawaii, Limited v. Warner,* 480 F.2d 1166, 1169 (D.C.Cir.1973). Under either the substantive or procedural prong of this test, plaintiff must prevail.

In the following discussion, the comments of several of the panel members concerning their scoring are discussed. This Court is certainly not in a position to pass judgment on the integrity of any member of the panel. And the Court's comments are not directed toward any individual's ability, or lack thereof, to evaluate fairly the proposals for the license agreement. It appears to the Court, after reviewing the evidence, that Major McNeill had an idea which appeared viable on paper but in practice did not accomplish the ends for which it was designed.

The panel, as the delegates of Major McNeill, fill the role of decision-maker in the instant case. As a group, their selection of the Courier could have been justified by many reasons. Individually, however, its

members have been unable to proffer any reason for many of the points they awarded. If the evidence had shown that the members understood the fundamentals of the scoring process and the criteria for evaluation, then plaintiff's motion for relief would be denied forthwith. However, plaintiff has demonstrated that some of the panel members were so ill-informed as to their mission so as to render the scoring procedure itself defective.

The effect of the panel's lack of understanding of the process in which they were involved is best illustrated by Mr. Boram, who represented the Office of the Comptroller. Mr. Boram was undoubtedly hampered by the passage of time between the meeting in November, 1982 and the taking of his deposition in February, 1983 during which the following exchange occurred:

Q: Mr. Boram, do you recall any discussions as to how you were to go about scoring within each category?

A: We had the contracts available for each of us, the proposals that we all looked at.... [A]s far as a specific method of scoring—... we had the points ... on the format, ... our scoring sheet. [T]he points were there, and that was ... the maximum. [A]nd we were supposed to put the point that we thought was based on what was in the proposal that best fit the categories; and, of course, the max being the highest number, and the lower number down was the least favorable. Other than that, I don't remember anything.

Q: Mr. Borum [sic], did you understand that where two proposers proposed the same thing, they should receive the same score?

A: No, I didn't understand that.

Q: You did not understand that?

A: No.

Q: What was your understanding as to how you were to score proposers when they proposed the same thing?

A: Just—I don't really know how to answer that, other than, you know, based on the proposal people made up their minds from that.

I don't, you know, I don't know. I don't know what to say on that one. I don't know how to answer that one. (Boram Deposition Tr., pp. 13–14).

Mr. Boram indicated that he had no newspaper experience and no knowledge of most of the technical terms involved in the evaluation process. However, throughout the evaluation process he consistently awarded one bidder the maximum number of points in every category. Throughout his deposition, Mr. Boram could not offer any reason for his disparate scoring of the bids when seemingly similar proposals had been made by the parties. The inconsistency was particularly evident in the areas of news supplements, the establishment of a local office, ad-free pages, grade of newsprint, and "body types."

Other panel members reached comparably consistent results on various factors listed on the evaluation sheets. A detailed listing of these "transgressions" is unnecessary in view of my finding that Mr. Boram's scoring had no rational basis which in turn flawed the entire procedure devised by Major McNeill. The use of personnel with a limited understanding of technical bids (with one exception) did not provide the bidders here with the "fair and equal opportunity" mandated in 32 CFR § 202.11(b)(1).

In reaching this conclusion, I have not taken lightly the admonitions of many courts against intruding into areas within an agency's exclusive domain. However, the publication of a post newspaper is not generally thought of as an area in which the employees of the Department of the Army have special expertise. Nor are the details of newspaper publication an area with which this Court professes experience. The granting of this injunction is not intended to be a substitution of this Court's choice of a Fort Stewart newspaper for that of the panel. The same result may well be reached upon reconsideration of the same proposals. All this Court is ordering is that each member of the panel, if a panel is used again, have a grasp of the procedure they are to use. On the evidence presented, the same cannot be said about the panel which

met in November, 1982. Reasoned decisions should issue from such a gathering, not arbitrary selections. See *Robert E. Derecktor of RI, Inc. v. Goldschmidt,* 506 F.Supp. 1059, 1066 (D.R.I.1980) (The decision must be said to be arbitrary and capricious, not based upon reason or judgment and which results in a conclusion which more likely reflects a knee-jerk reaction rather than a reasoning process.)

■ Maybe even more appropriate to the facts of this case is the standard of review articulated in *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The inquiry must turn upon whether the agency's choice was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* at 415, 91 S.Ct. at 823. During the course of this inquiry, the reviewing court must be satisfied that the agency not only employed procedures which conform to the procedural requirements of the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* and § 701 *et seq.* but which also conform to the agency's own internal procedures. *Oglala Sioux Tribe of Indians v. Andrus,* 603 F.2d 707, 713 (8th Cir.1979), *citing Morton v. Ruiz,* 415 U.S. 199, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974). This is true "even where the internal procedures are possibly more rigorous than otherwise would be required." *Id.* at 713; *Id.* at 235, 94 S.Ct. at 1074. I agree with plaintiff that the defendants' selection of the Courier was "arbitrary and capricious and otherwise not in accordance with law" because it did not comport with the requirements of 32 CFR § 202.11(b)(1). I also agree that the defendants' action was procedurally defective in that the members did not score similar proposals fairly. *See Keen Transport, Inc. v. United States,* 446 F.Supp. 5 (1976) (Lack of uniformity of treatment by an agency of similarly situated parties is impermissible).

#### B. *Irreparable Injury and Balance of Harms*

■ Defendants argue that the injury suffered by plaintiff will be primarily economic if the request for injunctive relief is denied. It is well-settled that the temporary loss of money is not an irreparable injury. *Group Health Inc. v. Schweiker,* 549 F.Supp. 135, 144 (S.D.Fla.1982), *citing Sampson v. Murray,* 415 U.S. 61, 90, 94 S.Ct. 937, 953, 39 L.Ed.2d 166 (1974). If that were the only injury suffered by plaintiff, injunctive relief would not be appropriate. However, because of procedures employed in the panel meeting, plaintiff was deprived of its opportunity to have its proposal fairly and equally considered. This injury is not monetarily compensable. Plaintiff has suffered irreparable harm through denial of this opportunity.

■ In a balancing of the harms, the test is whether the threatened harm to the plaintiff outweighs the threatened harm to the defendants. *Piedmont Heights Civic Club, Inc. v. Moreland,* 637 F.2d 430, 435 (5th Cir.1981).

Major McNeill testified that in his opinion the effect of temporary nonpublication of the Patriot on the military and related public would be as follows:

> Well, emotionally, total devastation. There's no doubt. There's too many important things that are in there, that are broadcast in there that we don't get in the local papers. We could not get the policies in the local paper. We're talking about morale support activities, groups coming on Post, Ft. Stewart, activities, recreation activities for the soldiers, things to do. And, of course, we're always concerned of what our soldiers can do and should do, and information placed along, not only information on up-coming exercises that we are going on. We've just got too large of an audience, and it's well known throughout, all through the commands. I'm talking about First Sergeants, Sergeant Majors, Battalion Commanders, that the "Patriot" is the important source of information.

(Hearing, p. 58).

Intervenors cite considerable expenditures incurred after the award of the license agreement which would be lost if an injunction was entered. They also cite the harm which would be done to local merchants in

the Hinesville area who have depended upon advertising placed in the Patriot.

However, the harm suffered by the plaintiff from the arbitrary and capricious agency action is of greater significance in this Court's view. The absence of the services rendered by the Patriot will be noticed by the military community. Notwithstanding, the temporary void can be adequately filled by other means. There is also no doubt that, if the license agreement is awarded to another publisher, the Courier will have lost money on this foray. However, the loss of funds invested is merely speculative in that there is every possibility that the license would again be the Courier's. And local merchants who advertise in the Patriot now will surely advertise in the Patriot if it is published by another.

The Court views the possible "harms" offered by defendants and intervenors to be of a lesser magnitude than that suffered by the plaintiff principally because the former harms may be remedied. The non-publication of the Patriot, if halted, at all, would only be temporary. If the license is awarded to another, the Courier could liquidate the assets acquired or put them to another use. The plaintiff, through the actions of the panel, has no options. Its one opportunity for fair and equal consideration was foreclosed. The Court finds that the harm suffered by the plaintiff outweighs the threat of harm to the defendants and intervenors.

## C. *Disservice to the Public Interest*

■■■ It is settled law that where an administrative agency has exceeded its authority, or failed to follow the applicable requirements of agency regulations, and has failed to act in the public interest, court intervention is appropriate. *City of Rochester v. U.S. Environmental, Etc.,* 496 F.Supp. 751, 765 (D.Minn.1980), *citing Train v. City of New York,* 420 U.S. 35, 95 S.Ct. 839, 43 L.Ed.2d 1 (1975); *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Furthermore, even the strong public interest in avoiding disruption of the procurement process must give way to the public interest in requiring agencies to stick to their regulations. *City of Rochester, supra,* at 765. Once it appears that a plaintiff will prevail on the merits of its claim, the Court still must be satisfied that affirmative relief would be beneficial to the public interest. *Aero Corp. v. Department of the Navy,* 540 F.Supp. 180, 211–212 (D.C.D.C.1982). I have previously stated that plaintiff has satisfied its burden of showing a likelihood of prevailing on the merits. I now find that a grant of relief to the plaintiff would not disserve the public interest. The temporary disruption which may result to defendants and intervenors does not outweigh the public's interest in the assurance that its government will follow the guidelines it sets for itself and maintain standards of fair dealing.

## IV. Conclusion

Accordingly, upon a review of the record herein, the Court concludes that the panel acted arbitrarily and capriciously in the scoring methods used to reach a recommendation on the recipient of the license agreement. Furthermore, the Court finds that the Department of Defense acted arbitrarily and capriciously and contrary to the law in accepting the recommendation of the panel as to the recipient of the license agreement. Therefore, the award of the license agreement shall be voided. Plaintiff has also shown that it is entitled to a preliminary injunction and its motion for the same shall be granted with the following conditions.

1) The edition of the Patriot which is to be distributed to its consumers during the week of April 11, 1983 shall go forward.

2) This matter is remanded to the Department of Defense for reconsideration in light of this opinion. Reconsideration need only include a re-appraisal of the proposals. Defendants are not required to solicit new bids for the license agreement nor are they required to allow the bids previously submitted to be re-done by the respective publishers.

3) Defendants shall have thirty (30) days from the date of this Order to accomplish the same. The injunction shall expire by its terms on that date. If defendants have completed their evaluation and recommendation before the expiration of this time, they may move the Court lift the injunction.