**WASHINGTON MECHANICAL CONTRACTORS, INC.,**
Plaintiff,

v.

**UNITED STATES DEPARTMENT OF the NAVY, Rear Admiral William M. Zobel, its Commander of Naval Facilities Engineering Command, and Arntz Contracting Co., Defendants.**

**No. C–84–5671 RFP.**

United States District Court,
N.D. California.

Sept. 21, 1984.

Henry C. Bunsow, Townsend & Townsend, San Francisco, Cal., Wade R. Dann, William R. Zoberst, Ulin, Dann, Elston & Lambe, Seattle, Wash., for plaintiff.

Patrick S. Bupara, Sandra L. Willis, San Francisco, Cal., John McCall, John Rosenberg, Riede, Rosenberg, McCall & Cahill, San Rafael, Cal., Douglas P. Hinds, Office of the Gen. Counsel, Dept. of Navy, San Bruno, Cal., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

PECKHAM, Chief Judge.

### Introduction

This case involves a dispute over the award of a contract for a variety of repair work on the "Star Barracks" at the Treasure Island naval base. On July 26, 1984, the Navy awarded the contract to defendant Arntz Contracting Co. (hereinafter referred to as "Arntz"), after Arntz prevailed in a bid protest filed on June 19, 1984 with the Navy. On August 13, 1984, the plaintiff, Washington Mechanical Contractors, Inc., (hereinafter referred to as "WMC"), filed this suit requesting that the court permanently enjoin the Navy from continuing its contractual relationship with Arntz, and that the court order the Navy to award the contract to WMC.

WMC makes two basic arguments. First, WMC argues that the Arntz protest was incorrectly decided and that the Navy should not have considered the Arntz bid in awarding the contract. Second, WMC alleges that the Navy violated a number of relevant regulations, and that as a result of these violations, the Arntz contract should be set aside. If the court sets aside the Arntz contract, then WMC becomes the low bidder on the Star Barracks project.

WMC obtained a temporary restraining order on August 14, 1984 from Judge Robert H. Schnacke. The hearing on a preliminary injunction and the trial on the merits was consolidated and began on August 28, 1984. On August 29, 1984, the court ordered that the defendant Arntz Contracting Co. be joined as a defendant, and that the trial be continued to September 14, 1984.

The court, having heard and considered the evidence, makes the following findings of fact and conclusions of law.

### Findings of Fact:

The Navy solicited bids for miscellaneous repair work on the Star Barracks (so

named for their configuration) at the naval base on Treasure Island. The Navy set the bid opening for June 18, 1984 at 2:30 p.m.

It is undisputed that WMC's bid was received on time. At some time before 2:30 p.m., the officer in charge of the bid opening, Roger Helbig, walked from the bid room into the anteroom that contained the bid stamp clock, saw that the clock face read "2:30", returned to the bid room, and announced that the time for bid opening had arrived.

Then, Mr. Helbig walked back out into the anteroom to collect the bids which had arrived prior to his declaration. As he was walking out of the bid room, Mr. James Vick, the bonding agent for Arntz was walking into the anteroom. Mr. Vick had been standing at a wall phone until 2:29 waiting for Arntz's final bid figure from Mr. Kenneth Arntz. Mr. Vick had previously synchronized his watch with the Pacific Bell phone company's time service. When Mr. Vick received the final figure, he inserted the figure into the bid forms, sealed the bid envelope, and walked rapidly to the bid room. It took Mr. Vick less than thirty seconds to reach the bid anteroom.

Upon Mr. Vick's arrival into the anteroom, he said something to the effect that, "I have a bid and want to submit it." Mr. Helbig met Mr. Vick, and told him that he was too late, and that Mr. Helbig was not going to stamp in the Arntz bid. Mr. Vick tried to stamp the envelope in himself, but he just made a smear on the envelope.

At that time, an assistant who was present in the anteroom said that Mr. Vick could at least stamp his envelope in, and someone stamped the bid in. By this time 30 seconds to a minute had elapsed, and the stamp read "2:31". Mr. Helbig then took possession of the Arntz bid.

After the Arntz bid was stamped, Mr. Helbig and Mr. Vick entered the bid opening room and Mr. Helbig opened and read all the bids that had arrived prior to Mr. Helbig's bid declaration. Mr. Vick was present during this time. After the reading it was clear that, but for an apparently irregular bid of $700,000, WMC's bid of $1,347,400 was the low bid.

At the close of the bid opening, Mr. Helbig gave the Arntz bid back to Mr. Vick. At some time after the bids were read, Mr. Helbig overheard Mr. Vick exclaim that Arntz would have been the low bidder. Mr. Vick left the bid opening room with the Arntz bid and phoned Mr. Arntz to tell him what had happened. Mr. Arntz then told Mr. Vick to come to his office, and Mr. Vick did. Mr. Vick gave Mr. Arntz the bid envelope, and Mr. Arntz put the envelope in the file on this project, where it remained, unopened, until Arntz resubmitted the bid about a month later at the request of the Navy.

On June 18, 1984, the day of the bid opening, the bid clock was tested and was determined to be a minute and a half fast, and reset. The clock has no second hand, and only stamps the time to the last full minute. Thus, a stamp of "2:30" could be either 2:30:01 or 2:30:59. When the clock moves to the next whole minute, it emits a "click" sound. Ms. Nancy Dominguez, a management assistant, who was present when Mr. Vick came into the anteroom, testified that she tested the bid clock three times on June 18, 1984.

First, during the bid opening, Ms. Dominguez and an unidentified assistant tested the clock. The assistant called the phone company's time service, and repeated what she heard the recorded voice saying ("at the time of the tone it will be 3:01:10," etc.). Meanwhile, about ten feet away, Ms. Dominguez listened for the "click" of the clock that would indicate that the clock had just turned to the next whole minute ("3:02:00" at the "click"). In this manner, they determined that the clock was a minute and a half fast, but did not reset the clock at this time.

Later that afternoon, two officers from the Navy came to the bid office and in response to their request, Ms. Dominguez stamped a piece of paper. One of those officers was Ensign Cynthia Lassnoff, and she testified that she thought the clock was three minutes fast.

Finally, sometime later that same afternoon, Ms. Dominguez and an assistant again tested the clock using the phone company's time service; at this time Ms. Dominguez reset the clock. Then, they continued to listen to the phone company and the clock to set the clock to within five seconds of the phone company's time.

On June 19, 1984, Arntz filed a bid protest with the Navy. On about July 15, 1984, the Navy decided that the bid protest was valid, and asked Arntz to resubmit the bid, which it did a few days later. The bid envelope was submitted to the Bureau of Alcohol, Tobacco, and Firearms for a test to determine if someone had opened and resealed the bid envelope. The test was apparently done by the post office on July 19, 1984. The test results show, along with the testimony of Mr. Arntz and Mr. Vick, that the bid envelope had not been opened and resealed after Mr. Vick sealed it on June 18, 1984.

From June 18, 1984 until July 18, 1984, WMC had no knowledge that Arntz had protested, or that the Navy had decided to allow Arntz to submit its bid. During this time, in conversations between WMC and the Navy, the Navy discussed the Star Barracks project as if WMC would get the award. It was not until July 19, 1984, when Mr. Patrick Marker of WMC phoned the Navy to inquire about the progress of the contract award, that WMC found out about the Arntz protest. Mr. Marker spoke with Ms. Barbara Accomazzo at the Navy who told him of the Arntz protest, but said that it would not be successful. Mr. Harrell Britton, an officer and employee of WMC, then called the Navy on July 25, 1984, to inquire about the Arntz protest, and he spoke with Mr. Peter L'Angelle. Mr. L'Angelle informed Mr. Britton that the Navy had ruled favorably on Arntz's protest and was going to award the contract to Arntz. Mr. Britton said he thought that WMC might protest this, but that he would talk to his lawyer. Mr. L'Angelle said that protesting was WMC's "perogative," but that it should be in writing. Mr. L'Angelle also told Mr. Britton that the Arntz award would not be made for about a week.

That same afternoon, Mr. Helbig, having overheard Mr. L'Angelle's portion of the conversation, and fearful of a WMC protest, called Mr. Britton to dissuade him from protesting. Mr. Britton said he would talk to his attorney and call Mr. Helbig the next day. After conversations with Mr. Britton, Mr. William Zoberst, counsel for WMC, sent a written protest to the GAO that evening. Mr. Zoberst also sent a copy of the protest to the Navy four minutes later. The GAO received the WMC protest the next morning, July 26, 1984. The Navy did not receive its copy until July 27, 1984.

The morning of July 26, 1984, around 10:25 a.m., Mr. Britton and Mr. Zoberst phoned Mr. Helbig and informed Mr. Helbig that WMC had filed a GAO protest. The court does not find that WMC also made it clear to Mr. Helbig that WMC was protesting directly to the Navy.

Mr. Helbig then referred them to Mr. Alexander Barna, an assistant counsel for the Western Division, Office of General Counsel. Mr. Zoberst called Mr. Barna around 3:00 p.m. on July 26, 1984 and told Mr. Barna about the GAO protest. Mr. Barna testified that he knew WMC was protesting, and he did not ask for further written confirmation because he knew something written was coming from WMC. The court takes this to mean that the Navy knew the GAO protest was filed, that that they were anticipating the arrival of their copy.

That afternoon at approximately 5:15 p.m., however, the Navy awarded the contract to Arntz. The Navy did not contact the GAO concerning the Arntz award. WMC did not find out that the Navy had made the award until August 3, 1984, when Mr. Britton contacted the Navy.

### Conclusions of Law

WMC challenges the Navy's failure to comply with a number of federal administrative regulations relating to procurement and bid protests. Thus, jurisdiction is

proper in accordance with 28 U.S.C. section 1331.

Venue in the United States District Court for the Northern District of California is proper because this action is brought in the district where the claim arose, in accordance with 28 U.S.C. section 1391(a).

### A. The timeliness of Arntz's bid.

■ The Comptroller General opinions consistently reflect the presumption that the bid officer's declaration of bid opening time is correct. *Carlson & Associates,* B–211918, November 21, 1983, 83–2 CPD 599; *Hatch Construction & Paving,* B–204810, November 4, 1984, 81–2 CPD 387. Unless the protestor shows "clearly" that the time of the bid declaration was inaccurate, the bid declaration stands. The burden of proof is on the protestor to prove his case.

■ In those cases in which the Comptroller General finds that the protestor did not establish a clear record, the protestor had nothing more than the assertion that his wristwatch was more accurate than the bid officer's wristwatch (or bid clock). *See, e.g., Hatch Construction & Paving, supra.* When the evidence is that the protestor and the bid officer just disagree about the time, the presumption of a correct declaration prevails.

In Arntz's case, the Navy determined that Arntz had met its burden of proof that the clock was fast. Using the statements by its own personnel that the bid clock was at least a minute and a half fast on June 18, 1984, the Navy asks, what clearer record could there be?

To upset the Navy's decision, WMC must show that the decision of the Navy was arbitrary and capricious. 5 U.S.C. 706(2)(A). The Navy argues that in order to do this, WMC, the protestor in this case, must meet at least a minimal burden of showing affirmatively that the clock was accurate. The problem is that it is impossible for any bidder in WMC's position to prove that the clock, which is in the control of the Navy, was accurate. And, WMC did not present any evidence to show that the

clock was accurate; rather WMC relies on the presumption that the bid declaration is accurate.

■ Instead, WMC attempted to discount the validity of the Navy's tests on the bid clock, to show that the Navy's decision was arbitrary because there was no clear record of the of the bid block. WMC has, however, also failed to convince the court that the Navy acted arbitrarily in relying on Ms. Dominguez's tests on the clock.

While the technique by which Ms. Dominguez tested the clock certainly does not seem like a very professional procedure, this does not mean that the Navy acted arbitrarily in considering the tests as evidence that the clock was fast. The Navy, then, had more than Mr. Vick's allegations that his watch was more accurate than the bid clock, on which to base its determination that Arntz's bid was timely.

Furthermore, the presumption that a bid declaration is accurate seems primarily to be a presumption to protect the government agency from every disappointed late bidder who might claim that his watch is better than the bid clock. When the Navy agrees that its own equipment was faulty, the presumption that the bid declaration is accurate no longer need apply.

Thus, the court finds that the Navy's decision resolving the Arntz protest in Arntz's favor was not arbitrary and capricious.

WMC also presents four alleged violations of relevant administrative regulations for the court's consideration. Each of these violations, WMC argues, are grounds for invalidating the award to Arntz and for ordering the Navy to award the contract to WMC. The court now turns to these arguments.

### B. The procedural arguments.

Bid protests can be made either to the Navy or to the GAO. The Federal Acquisition Regulations, contain the Navy's bid protest procedure. The bidder may protest directly to the Navy in two ways: 1) orally,

and 2) in writing, if the agency requests a writing.

The General Accounting Office's role in bid protest proceedings is defined by regulations contained at 4 C.F.R., Subpart 21 (1984). These regulations provide a contract bidder with another way to protest an agency's procurement decision—directly to the GAO.

The analysis the court used in disposing of WMC's four procedural claims is: 1) what regulations apply and how should they be interpreted? 2) did the Navy violate these regulations?, and 3) if the Navy violated these regulations, should the court invalidate the Arntz contract and require the Navy to contract with WMC?

The last question is the most difficult, because it involves a balancing of two important policy considerations. Counsel for WMC advances case law support for the proposition that "agency action which violates a published regulation is 'not in accordance with law' within the meaning of 5 U.S.C.A. section 706(2)(A) [of the Administrative Procedure Act]." *Ainslie Corp. v. Middendorf,* 381 F.Supp. 305, 308 (D.Mass. 1974). The argument is that if the agency does not follow one of its own published regulations, the court may properly find that the agency's action is arbitrary and not in accordance with the law, and therefore may overturn the agency action. The policy interest which this argument represents is the interest in requiring agencies to "stick to their regulations." *Georgia Gazette Publ. Co. v. United States Depart. of Defense,* 562 F.Supp. 1004, 1011 (S.D.Ga. 1983).

Balanced against this is the policy interest in avoiding disruption in procurement decisions. *M. Steinthal & Co. v. Seamans,* 455 F.2d 1289, 1300 (D.C.Cir.1971) (recognizing the interest in "taking account of this strong public interest in avoiding disruptions in procurement, and [in] withholding judicial interjection unless it clearly appears that the case calls for an assertion of an overriding public interest 'in having agencies follow the regulations which control government contracting.'"). *Accord,*

*James Luterbach Const. Co., Inc. v. Adamkus,* 577 F.Supp. 869, 871 (E.D.Wisc. 1984) (*citing Steinthal* and noting, "[t]his principle places the burden of proof on a bidder challenging a federal procurement award").

Not surprisingly, the Comptroller General opinions, discussed below, favor this policy interest, holding that if an agency violates a procedural regulation, this alone should not invalidate an otherwise valid contract.

Some courts, however, have resolved the balance in favor of voiding a contract which an agency enters into after violating a particular procurement regulation. As a district court in Georgia said:

> It is settled law that where an administrative agency has exceeded it authority, or failed to follow the applicable requirements of agency regulations, and has failed to act in the public interest, court intervention is appropriate....[citations omitted] Furthermore, even the strong public interest in avoiding disruption of the procurement process must give way to the public interest in requiring agencies to stick to their regulations.

*Georgia Gazette Pub.,* 562 F.Supp. at 1011.

■ Before striking the balance in favor of voiding a contract, however, the court must be satisfied that the facts meet the standard used in the Third Circuit: "clear illegality." *Sea-Land Service, Inc. v. Brown,* 600 F.2d 429 (3d Cir.1979) ("A showing of clear illegality is an appropriate standard to impose on an aggrieved bidder who seeks judicial relief," *id.* at 434). In a close case, then, the court will resolve doubt in favor of the Navy.

*1. The return of the Arntz bid.*

■ Mr. Helbig gave the Arntz bid back to Mr. Vick in clear violation of the applicable FAR which provides: "Late bids, modification of bids, or withdrawal of bids that are not considered for award shall be held unopened, unless opened for identification, until after award and then returned with other unsuccessful bids." FAR 14.304–3.

Mr. Helbig testified that he thought there was ambiguity in the relevant FARs on whether Arntz should have gotten its bid back. The court rejects the contention that the regulations are ambiguous. Moreover, the Navy did not really contest the impropriety of giving the Arntz bid back to Mr. Vick.

The Navy's argument is that the regulation, which is at least partly based on a concern for the integrity of the competitive bidding system, only requires it to be vigilant and to guard against the possibility of fraud. The Comptroller General opinions have said that, if the agency is satisfied that there has been no impropriety, the agency may accept returned bids. *See, e.g., Delbert Bullock*, B–208496, September 7, 1982, 82–2 CPD 201. The test by the Bureau of Alcohol, Tobacco and Firearms satisfied the Navy that no fraud had occurred.

WMC denies that the precautions the Navy took were sufficient to guard against fraud, though it denies that it is accusing the Navy or Arntz of fraud. WMC argues that the regulations requiring bidding officers to retain unopened bids protect the integrity of the bidding procedure, and any deviation from this regulation seriously undercuts this integrity. The court agrees with WMC that the Navy should have adhered to this regulation because then no difficult issues of fraud and returned envelopes would arise. But, if a mistake is made, the court also finds that it is possible for the Navy to cure this mistake by tests such as the one performed on the envelope in this case.

WMC also argues that allowing Arntz to resubmit the bid gave Arntz an impermissible option to return the bid only if it wanted to remain in the bidding. Arntz seemingly had a choice the other bidders did not have; after hearing the bids, Arntz could decide if it still wanted to be considered for the job. The Navy admitted that it could not have forced Arntz to return the bid. This option argument, however, is unpersuasive. An "option" is present any time a disappointed bidder contemplates whether he will protest any action by the agency that results in his bid not being accepted. The disappointed bidder has the choice of pursuing a protest, and perhaps winning the award, or deciding, after the bids are opened, not to pursue the contract. If the government is going to allow bidders to protest, the potential for an "option" will always exist.

Thus, the court finds that the Navy cured the violation of the FAR on the return of late bids, by vitiating the possibility that the someone had fraudulently tampered with the envelope. Therefore there is no showing of "clear illegality" here, and the court does not feel compelled to find that the interest in requiring literal adherence to the regulation is strong enough to invalidate the Arntz award.

## 2. Failure of the Navy to notify WMC of Arntz's bid protest.

The FARs provide that when a contracting officer receives a protest, the officer should notify other bidders who are "affected" by the protest, "in appropriate cases." FAR 14.407–8(3). WMC clearly was a party "affected" by the Arntz protest—if Arntz was successful, then, as lowest bidder, it would receive the contract. But at the bid opening, on June 18, 1984, the apparent low bidder was WMC, and at least up until July 19, 1984, WMC believed that it was going to get the award.

The issue is what the "in appropriate cases" language of the regulation means. Mr. Helbig testified that one of the reasons why he did not inform WMC of the Arntz protest was because WMC could not have supplied the Navy with any information regarding the accuracy of the bid clock. Certainly any time a party has pertinent information on the subject matter of the protest, the case would be "appropriate" for notice. The question is whether anytime a bidder is "affected," the case is appropriate for notice.

The old procurement regulations did not contain this "in appropriate" language, requiring the agency to give notice to any affected party when a protest was filed.

32 C.F.R. 2.407–8 (1973). WMC cites a case that discusses these old procurement regulations, *Ainslie Corp. v. Middendorf,* 381 F.Supp. 305 (D.Mass.1974). There, a disappointed bidder, Ainslie, sought a preliminary injunction against the award of a contract to a company that had filed a protest and prevailed. The Navy did not give notice to Ainslie of the protest, despite the fact that Ainslie was the lowest bidder. The court said that the language in the regulations was mandatory and that the Navy had to give notice to Ainslie who was obviously involved in and affected by the protest.

Even setting aside the difference in the regulations, *Ainslie* is distinguishable from the present case. In *Ainslie* the protester was making a complaint about the sufficiency of the Ainslie bid—and the Navy still did not inform Ainslie. Rather, the Navy just disqualified the Ainslie bid as unresponsive and made the award to another company. Obviously, if the Navy had notified Ainslie of the protest, the corporation could have given the Navy relevant information about its own bid, the very subject of the protest. Here, WMC had no information on the bid clock.

Moreover, in considering the difference in the language of the regulations in 1973 and in 1984, the inclusion of the "in appropriate cases" language only works to limit the scope of the *Ainslie* decision. The notice provision is no longer unqualified and mandatory; not all affected bidders need be notified of pending protests.

Common sense dictates that the Navy personnel in this case should have informed WMC of the Arntz protest soon after it was lodged; WMC should not have had to call the Navy to find out about the protest. Moreover, WMC received inaccurate information about the status of the protest—on the 19th of July, the Navy had already decided to allow Arntz to submit its bid. This is no way to head off ill-feelings and potential protests.

■ But, the Navy's lapse in common sense does not necessarily demonstrate a clear violation of the applicable regulation.

Arguably, the main policy the regulation embodies is the policy of insuring that affected bidders who have relevant information on a bid dispute are able to tender that information to the agency before the agency makes a decision. This policy was not violated here. Again, the court will not override the interest in noninterference with the procurement process simply because the Navy personnel failed to take action that could have easily prevented this lawsuit.

*3. WMC's oral protest to the Navy.*

■ WMC alleges that on July 26, 1984, in the 10:25 a.m. conversation between Messrs. Zoberst and Britton and Mr. Helbig, Mr. Zoberst told Mr. Helbig that WMC was protesting the award directly to the Navy. All the Navy witnesses deny that WMC ever directed a protest to the Navy about the Arntz contract. As stated in the Findings of Fact above, WMC has just not demonstrated to the court that WMC clearly directed an oral protest to the Navy on July 26, 1984. The evidence is clear that the Navy knew WMC was protesting to the GAO, but this is not the same as the Navy having knowledge that WMC was making a protest to the agency. Therefore, the court does not consider WMC's allegations that the Navy failed to follow the applicable procedures regarding bid protests directly to the agency.

*4. WMC's protest to the GAO.*

WMC filed a protest with the GAO on the morning of July 26, 1984. The dispute is over the Navy's obligation, if any, resulting from this filing. The court found above that, by the phone call on the morning of July 26, 1984, the Navy knew that WMC had filed the GAO protest. Mr. Helbig testified that WMC only said they "sent" the protest; the point is that the Navy knew that WMC was serious about the GAO protest and knew that it was highly likely that the protest had reached the GAO office. If there was any doubt, at 3:00 p.m., Mr. Barna was informed that WMC had filed its protest, and he testified

that he knew WMC was "protesting" and that he did not ask for a "further" confirmation because he knew something was coming in the mail.

Thus, according to WMC, the Navy officials came under a duty to notify the GAO before making the award to Arntz. The FARs defined the agency's role when a bidder protests to the GAO:

(b) *Protests before award.*

. . . . .

(3) ... When it is known that a protest has been lodged directly with the GAO, a determination to make award under subparagraph (4) below must be approved at a level above the contracting officer in accordance with agency procedures. While award need not be withheld pending final disposition by the GAO of a protest, a notice of intent to make award in such circumstances shall be furnished the GAO.

FAR 14.407–8(b)(3).

WMC's argument is that "known" includes actual knowledge of the kind the Navy had here. The Navy admits that it did not follow the procedures set out in FAR 14.407–8(b)(3). The Navy's position is that oral notice *from the protester* that a GAO protest has been filed, does not trigger the Navy's responsibilities under the regulation.

The Navy points to the GAO regulations requiring the GAO to notify the agency of any protest within one day. 4 C.F.R. section 21.3 (1984). The Navy also points to C.F.R. regulations which require the protestor to file a copy of the GAO protest concurrently with the agency. 4 C.F.R. section 21.1(c) (1984). These regulations, the Navy argues, prove that WMC should have made sure the Navy had a copy of the GAO protest on July 26, 1984, and that until the Navy got a written copy of the protest or until GAO informed the Navy orally or in writing of the GAO protest, the Navy had no duties under FAR 14.406–8(b)(3). The GAO notice did not come until July 27, 1984, and the copy of WMC's protest was not "filed" in the Navy office until July 27, 1984.

One Comptroller General opinion considered a case similar to this one. *In the Matter of Data Test Corporation,* B–181199, December 20, 1974, 54 Comp.Gen. 499. In this case, the protestor sent a written notice of protest to the GAO which was filed at 9:33 a.m. on a Friday. Early that afternoon the agency made the award to another company. That afternoon, after the contract was awarded the protestor called the agency and informed the agency of the GAO protest. Soon after the phone call, the copy of the GAO protest arrived in the agency's office. The GAO notified the agency of the protest by the next working day, Monday.

The Comptroller General noted that while the GAO protest was technically filed before the award, the agency could not be faulted because there was no evidence that the agency was "on notice" of the protest at the time of the award. It is not clear if the Comptroller General would have "faulted" the agency if the protestor had called the agency just a few hours earlier, before the contract was actually awarded, which is what happened in this case. Arguably, the point of the regulations regarding concurrent filing and GAO's responsibility to notify the agency, is to insure that the agency acquires actual knowledge.

■ The policy behind FAR 14.407–8(b)(3) is to provide the GAO with a chance to offer some comment to the agency on the contract dispute, and it was not well-served by the Navy's reading of the regulations. Therefore, the court rejects the Navy's argument and finds that actual knowledge did trigger the Navy's duty to follow FAR 14.4–7–8(b)(3) in this case. The question is now whether the failure of the Navy should be grounds for invalidating the contract.

WMC cites a Rhode Island district court decision in which apparently the protestor had properly filed all notices concerning his GAO protest. *Derecktor v. Goldschmidt,* 506 F.Supp. 1059 (D.R.I.1980). The Coast Guard officials had clearly failed to notify the GAO before they awarded the contract

to another party. The court in *Derecktor* said:

> ... the failure to comply with the regulations cannot be considered to be in accord with law or in observance of procedure required by law, and, is therefore a violation of 5 U.S.C. [section] 706(2)(A) and (D). Agency regulations have the force and effect of law. [citations omitted].... Agency action not in accord with regulations is not in accord with law. [citation omitted].... The Coast Guard's action in awarding the contract to Tacoma must be held to be unlawful and must be set aside.

*Id.* at 1063. The Navy, on the other hand, cites a number of Comptroller General opinions for the proposition that agency failure to follow procedural regulations will not invalidate an otherwise valid contract. *RCA Service Co.*, B–208871, August 22, 1983, 83–CPD 221; *Martin Tool and Die, Inc.*, B–208796, January 19, 1983, 83–1 CPD 70.

In balancing the policy interests, the court declines to follow the *Derecktor* case to the extent that it says any failure to comply with a regulation warrants setting aside an agency contract. The policy interest in getting GAO comment here is important, but the GAO cannot stop the award. In this case, the court has already found that the Navy's resolution of the Arntz protest was proper. The court finds that the interest in not interrupting this particular procurement project any more than necessary is the weightier interest here.

### Conclusion.

For the foregoing reasons, the court finds against the plaintiff. This result does not indicate that the court is pleased with the fact that bids for billions of dollars in procurement contracts are not clocked in and monitored with more care than the Navy took in this case, or with the Navy's handling of the WMC and Arntz disputes. Simple actions could have prevented this costly litigation.

There is a point at which a court might say that the interest in requiring the agency to "stick to its regulations" does outweigh the public interest in having government procurements go forward with as much dispatch as possible. It is just that this point was not reached in the instant case.