**MARK DUNNING INDUSTRIES, INC., Plaintiff,**

v.

**William J. PERRY, Secretary of Defense; John H. Dalton, Secretary of the Navy; and B.J. Anderson, Contracting Officer, Defendants,**

**Browning Ferris Industries of Florida, Inc., Defendant–Intervenor.**

Civ. A. No. 95–D–29–S.

United States District Court, M.D. Alabama, Southern Division.

May 15, 1995.

James Hill McLemore, Montgomery, AL, Karl Dix, Jr., Atlanta, GA, for plaintiff.

Leura Garrett, Asst. U.S. Atty., Montgomery, AL, James A. Sparks, Sp. Asst. U.S. Atty., Pensacola, FL, for defendants.

## MEMORANDUM OPINION

DE MENT, District Judge.

### BACKGROUND

Before the court is plaintiff Mark Dunning Industries, Inc.'s motion for preliminary injunction filed January 20, 1995. The plaintiff challenges the United States Department of the Navy's award of a contract to the apparent low bidder for collection and removal of solid waste at the Pensacola, Florida Naval Air Station.

The plaintiff, as the incumbent contractor and disappointed bidder, seeks to have the contract set aside and the bids resolicited on the basis that the contract solicitation is in clear and prejudicial violation of the Competition in Contracting Act, 10 U.S.C. § 2304(a)(1)(A). The successful bidder, Browning Ferris Industries of Florida, Inc. (hereafter "BFI"), joined the suit as a defendant-intervenor.

After the Navy opened the bids but before award of the contract to BFI, the plaintiff filed with the General Accounting Office[1] (hereafter "GAO") a protest, therein challenging the Navy's determination that BFI was the low bidder.[2] On December 7, 1994, the Comptroller General issued a decision

---

[1]. The GAO is a legislative agency, the head of which is the Comptroller General. The Comptroller General's statutory responsibilities include resolving bid protest disputes involving agency procurement decisions and rendering written determinations as to "whether the solicitation, proposed award, or award complies with statute and regulation." 31 U.S.C. § 3554(b)(1).

Moreover, the Comptroller General may require an agency, such as the Navy, to stay or suspend the award or performance of a government procurement contract until a decision is rendered. 31 U.S.C. §§ 3551–3556. Here, the plaintiff's contract was scheduled to expire in September of 1994. Pending the decision of the Comptroller General, the Navy stayed the award of the contract to BFI and extended the plaintiff's performance under the contract until January 31, 1995.

[2]. The plaintiff filed the protest by letter dated September 1, 1994.

denying the plaintiff's protest. Unsatisfied with the outcome, the plaintiff commenced this action on January 9, 1995, seeking injunctive and declaratory relief against the following defendants: William J. Perry, in his capacity as Secretary of Defense; John H. Dalton, in his capacity as Secretary of the Navy; and B.J. Anderson, in her capacity as a Contracting Officer for the United States Department of the Navy (collectively "the Navy"). The day after the plaintiff filed this lawsuit, the Navy awarded the contract to BFI.

On January 25, 1995, the court held an evidentiary hearing on the plaintiff's motion for preliminary injunction, the transcript of which is part of the record. After scrutinizing the evidence and arguments presented at the hearing, the court found that the GAO's decision disregarded several critical issues necessary for a resolution of the motion for preliminary injunction. Hence, in deferring to administrative expertise, the court remanded the action to the GAO for consideration of additional factual and legal issues. See Ct.'s Memorandum Opinion and Order, Jan. 31, 1995.[3]

On March 3, 1995, the GAO issued a response to the court's order.[4] The court then invited the parties to submit briefs in reply to the GAO's response. After careful consideration of the record as a whole and the applicable law, the court finds that the plaintiff's motion for preliminary injunction is due to be granted.

## JURISDICTION AND VENUE

28 U.S.C. § 1331 confers subject matter jurisdiction on district courts in disputes arising under the Competition in Contracting Act. See 31 U.S.C. § 3556, which recognizes "the right of any interested party[5] to file a protest with the contracting agency or to file an action in a district court of the United States or the United States Claims Court." Venue is proper pursuant to 28 U.S.C. § 1391(e).

## STANDING

The plaintiff's legal standing to appeal the GAO's decision lies in the Administrative Procedure Act, 5 U.S.C. § 701, et seq.. Section 702 provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review" thereof. The court finds that the plaintiff, as an unsuccessful bidder, has standing to challenge the agency's decision to award the contract to a third party. See Choctaw Mfg. Co., Inc. v. United States, 761 F.2d 609, 615–16 (11th Cir.1985) (holding that the losing bidder has standing to challenge the award of a government procurement contract).[6]

---

3. The court also stayed BFI's performance under the contract until it ruled on the plaintiff's motion for preliminary injunction. Hence, the plaintiff has continued its services under the contract.

4. The court specifically directed the GAO to certify to the court its findings of fact, conclusions of law and decision. The GAO, however, did not certify its response or provide any findings of fact or list its conclusions of law. Instead, the GAO merely wrote a letter to the court.

5. An "interested party" is defined in 31 U.S.C. § 3551(2) as "an actual or prospective bidder or offeror whose direct economic interests would be affected by the award of the contract or by failure to award the contract." Here, the plaintiff is an interested party by virtue of submitting a bid for consideration of the contract award. Furthermore, the court finds that the plaintiff's economic interests have been directly affected by the Navy's award of the contract to BFI.

6. When, as here, an unsuccessful bidder seeks resolicitation of bids for a government procurement contract, the court has the power to grant relief. District courts, however, may not order specific performance when a disappointed bidder seeks to enforce its own canceled contract. See 28 U.S.C. §§ 1346, 1491 (The Tucker Act), which precludes a district court from hearing claims "founded upon any express or implied contract with the United States." 28 U.S.C. § 1346(a)(2).

The distinction was explained in Choctaw Mfg. Co., Inc.: "A disappointed low bidder[,] . . . seeking the termination of a government contract with one party and the award of that contract to it, is not deemed to be making a claim for specific performance" under the Tucker Act. 761 F.2d at 621, n. 9, (quoted in Mark Dunning Indus., Inc. v. Cheney, 726 F.Supp. 810, 813 (M.D.Ala. 1989) (Thompson, J.), aff'd, 934 F.2d 266 (11th Cir.1991)).

## FINDINGS OF FACT [7]

The majority of facts are undisputed. On August 1, 1994, the Navy issued Solicitation No. N65114–93–B–2146 (hereafter "Solicitation") for solid waste collection and removal at the Pensacola, Florida Naval Air Station located in Escambia County, Florida.[8] The Solicitation was an Invitation for Bids, wherein the bidder submitting the lowest total price would receive the award of the contract as long as the bid was responsive to the material requirements contained therein. The Solicitation was a combination fixed-price, indefinite quantity contract for a base year plus four one-year options.

On August 30, 1994, the Navy opened five sealed bids it had received in response to the Solicitation. Of these bids, BFI was the apparent low bidder, while the plaintiff submitted the second lowest bid. BFI's bid for the base period (first year) totalled $1,060,-713.00, which was $12,416.63 less than the plaintiff's bid of $1,073,129.63.

The detailed provisions of the Solicitation essential to the court's consideration are as follows: Contract line number 0002 (hereafter "CLIN 0002") required each bidder to insert a unit price and total amount for the "REFUSE DISPOSAL FEE": [9]

| ITEM NO | SUPPLIES/SERVICES | QTY | UNIT | UNIT PRICE | AMOUNT |
|---------|-------------------|-----|------|------------|--------|
| | FIRM FIXED PRICE LUMPSUM WORK | | | | |
| 0002 | REFUSE DISPOSAL FEE (Per Para. C.22, C.23) | 14,400 | TN | $_____ | $_____ |

The bidders were to calculate the amount by multiplying the unit price by the Navy's estimated quantity of annual refuse (14,400 tons). BFI submitted a unit price of $28 per ton, while the plaintiff bid $30 per ton as its unit price. BFI based its unit price upon the refuse disposal fee in effect at a private landfill in Alabama,[10] which at that time charged $23 per ton of refuse. The plaintiff's unit price, however, reflected the $30 rate per ton in effect at the Escambia County, Florida landfill.

The bidders were to compute the unit price in accordance with paragraphs C.22 and C.23 of the Solicitation. Paragraph C.22 provides:

> The disposal fee on this contract will be invoiced separately as indicated in paragraph G.4. The disposal fee will be paid monthly based on the total cumulative tonnage delivered to the landfill each month as shown on the landfill's certified weight

tickets multiplied by the unit cost for the Refuse Disposal Fee on [CLIN] 0002 in the Bid Schedule. The disposal fee payment shall not exceed the actual fee charge shown on the landfill receipts or other evidence of payments to the landfill.... Contractor's [sic] must base their bids for the disposal fee that will be in effect on 1 October 1994. Future changes in landfill disposal fees shall be reported to the Contracting [O]fficer and adjustments to the disposal fee unit prices will be made in accordance with the Economic Price Adjustment Clause....

H'rg on Pl.'s Mot.Prelim.Inj., Def.s' Ex. 2 (brackets supplied).

The Economic Price Adjustment Clause is printed in paragraph I.7 and states, in pertinent part, as follows:

> (a) The Contractor shall notify the Contracting Officer, at any time during contract performance, the disposal fee unit

---

**7.** Rule 52(a) of the *Federal Rules of Civil Procedure* provides that "in granting or refusing interlocutory injunctions[,] the court shall ... set forth the findings of fact and conclusions of law which constitute the grounds of its action." Accordingly, the court makes the following findings of fact, which the court deems controlling in this action. The court's conclusions of law are contained in the next section.

**8.** The plaintiff has performed this particular contract since October 1, 1982.

**9.** The court has omitted CLIN 0001, as it is not relevant to this dispute.

**10.** BFI owns, controls and sets the prices for this landfill. H'rg on Pl.'s Mot. Prelim. Inj., Transcript at 28; Pl.'s Verified Compl., Ex. 2 attached thereto.

prices shown in the schedule in Section B either increase or decrease as a result of new landfill/disposal fees set by the *Escambia County Commissioners.* The Contractor shall furnish this notice within 20 calendar days after being notified of any increase or decrease, or within any additional period that the Contracting Officer may approve in writing. Adjustment for increases shall not be retroactive beyond the twenty calendar day notification period or such time as approved in writing by the Contracting Officer. Adjustments for decreases shall be made effective immediately on the date they are implemented by the landfill. The notice shall include the amount of the adjustment (increase or decrease), the effective date and supporting data explaining the cause of the adjustment.

. . . .

(d) No increase shall exceed the cost of using other alternative landfills which are available for use by the Contractor, considering the disposal fees, labor and transportation cost.

(e) Any price adjustment under this clause is subject to the following limitations:

(1) Any adjustment shall be limited to the effect on unit prices as a result of new landfill/disposal fees set by the *Escambia County Commissioners . . . .*

*Id.,* Def.s' Ex. 1 (emphasis supplied).

Two additional provisions in the Solicitation, the meaning of which are disputed, mandate compliance with all governing laws. Specifically, paragraph C.19, entitled "PERMITS," states that

[t]he Contractor shall, without additional expense to the Government, obtain all appointments, licenses, and permits required for the prosecution of the work. The Contractor shall comply with all applicable federal, state, and local laws. Evidence of such permits and licenses shall be provided to the Contracting Officer before work commences.

*Id.,* Pl.'s Ex. 1. Furthermore, bidders had to "comply with all applicable environmental protection requirements [and] with federal,

state and local laws and with regulations and standards as listed in [the Solicitation] regarding environmental pollution." Solicitation at ¶ C.11.

Of particular relevance to this lawsuit is a local ordinance in Escambia County, Florida, which requires collectors of non-residential waste to obtain a franchise from the county:

It shall be unlawful for any person, firm or entity to engage in the business of collecting and disposing of non-residential solid waste generated by any other person, firm or entity without having been granted a franchise by the County. Provided, however, nothing in this section shall be construed to require any generator of non-residential solid waste upon premises belonging to himself or itself from removing and disposing of such non-residential solid waste without first obtaining a franchise. All such removal, transporting and disposal of owner generated non-residential solid waste shall be transported and disposed of in the manner specified in applicable Escambia County Ordinances.

Ct.'s Ex. 1 attached hereto (Escambia County Ordinance No. 92–28). The franchise agreement, in turn, compels collectors to use the disposal facility "designated and/or provided by the County."

Since the enactment of the ordinance in August of 1992, the plaintiff has obtained a franchise from Escambia County and has hauled waste to the county landfill. Prior to the ordinance, the plaintiff always has used the county landfill in the performance of its contract with the Navy.

## LEGAL STANDARDS AND CONCLUSIONS OF LAW

### I. *Standard for Obtaining a Preliminary Injunction*

■ While *Federal Rule of Civil Procedure* 65 covers only procedural requirements for issuing a preliminary injunction, federal courts have interpreted Rule 65 to incorporate several common law substantive requirements. Generally, the party moving for a preliminary injunction must satisfy the following elements: (1) a substantial likelihood

of success on the merits; (2) a substantial threat of irreparable injury if the preliminary injunction is not granted; (3) that the threatened injury to the movant outweighs the threatened harm that the injunction may cause the opposing party; and (4) that granting preliminary injunctive relief is not adverse to the public interest. *Frio Ice, S.A. v. Sunfruit, Inc.*, 918 F.2d 154, 159 (11th Cir. 1990); Fed.R.Civ.P. 65. The purpose of a preliminary injunction is to protect the movant from irreparable injury and to preserve the status quo until the district court renders a meaningful decision on the merits. *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567 (5th Cir.1974).

In determining whether the plaintiff should prevail, the court balances the evidence proffered for each element. Hence, a heavier showing on one or more of the criteria will reduce the weight of proof required for the other factors. *Georgia Gazette Pub. Co. v. United States Dept. of Defense*, 562 F.Supp. 1004, 1008 (S.D.Ga.1983) (citation omitted). Finally, in determining the propriety of interim injunctive relief, the court bears in mind at all times that in bid protest disputes involving government procurement contracts, the court "must apply these precepts of judicial restraint more stringently, especially with respect to the factor of the likelihood of plaintiff['s] success on the merits." *Saco Def. Sys. Div., Maremont Corp. v. Weinberger*, 606 F.Supp. 446, 450 (D.Me.1985) (citation omitted) (brackets supplied).

## A. The Plaintiff's Likelihood of Success on the Merits

Before turning to the merits of the underlying case, the court must address two threshold issues. That is, the court must ascertain the legal standard for reviewing the decision to award the contract to BFI and the deference to be accorded to that determination.

The Administrative Procedure Act (hereafter "APA"), 5 U.S.C. §§ 701–706, restricts the scope of judicial review in evaluating agency action. The court may overturn the contract award decision [11] only if: "(1) [T]he procurement official's decisions on matters committed primarily to his [or her] own discretion has no rational basis, or (2) the procurement procedure involved a clear and prejudicial violation of applicable statutes or regulations." *Kinnett Dairies, Inc. v. Farrow*, 580 F.2d 1260, 1271 (5th Cir.1978) (citation omitted).[12] *See also Choctaw Mfg. Co., Inc.*, 761 F.2d at 616; *Mark Dunning Indus., Inc.*, 726 F.Supp. at 814.

This standard recaps the provisions of the APA, which provide that

[t]o the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

. . . .

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]

5 U.S.C. § 706 (brackets supplied) (quoted in *Shoals Am. Indus., Inc. v. United States*, 877 F.2d 883, 887 (11th Cir.1989)).

When reviewing agency action under the APA, the court must accord great deference to the agency's evaluation of bids and must not supplant its own judgment for that of an agency simply because the court finds the reasoning " 'ill-considered, or to

---

**11.** Where the Navy adheres to the recommendation of the GAO without further explanation, the court evaluates the Navy's decision by looking to the GAO's rationale. *See Mark Dunning Indus., Inc.*, 726 F.Supp. at 814, *supra* footnote 5. Here, the court has heard from the GAO, as well as the Navy, and will refer to the arguments and issues raised by each. The court notes, however, that their positions are fundamentally aligned.

**12.** Decisions of the former Fifth Circuit filed prior to October 1, 1981 constitute binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc*).

represent the less appealing alternative solution available.'" *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1299 (D.C.Cir.1971) (quoted in *Kinnett Dairies, Inc.*, 580 F.2d at 1271); *see also Shoals Am. Indus., Inc.*, 877 F.2d at 888 (reversing the district court for failing to afford sufficient weight to a GAO decision). In other words, the court should enjoin a government contract award only if "there has been a clear violation of duty by the procurement officials." *Kinnett Dairies, Inc.*, 580 F.2d at 1271. Hence, the court rejects the plaintiff's argument that the GAO's decision is "not entitled to any deference since the central issue in this case is whether a contractual document ... is ambiguous[,] which is the subject of *de novo* review." Pl.'s Reply to the GAO's March 6, 1995 Resp. to Ct. Order at 1, 9.

Rather, the court finds that the pendulum of deference swings more toward the standard articulated by BFI and the Navy. The court in *Mark Dunning Indus., Inc.*, another government procurement contract dispute involving the plaintiff, succinctly summarized the guiding principles:

> In determining whether the GAO's decisions are rational, or otherwise violate federal law, the court is guided by several well-established precepts. First, and most obviously, "judges are ill-equipped to settle the delicate questions involved in procurement decisions, where long and complex factual histories, subtle economic factors and the need for expeditious buying decisions require assessments 'better left to the expertise of an executive agency.'" Moreover, there is a "strong public interest in avoiding disruptions in procurement, and for withholding judicial interjection unless it *clearly* appears that the case calls for an asserting of an overriding public interest." Accordingly, whether it is reviewing the rationality of an agency procurement decision or determining that decision's compliance with federal law, a court should approach its task with deference and should interject itself only where the violation appears clear.

726 F.Supp. at 814 (italics in original) (internal citations omitted).

■ However, while the court should allow administrative agencies to function with minimum interference by the judiciary, "uncritical deference" to the GAO's decision is inappropriate. *Shoals Am. Indus., Inc.*, 877 F.2d at 889. "[T]here certainly may be instances where the District Court will find procurement illegality that the GAO failed to recognize, or at any event failed to correct." *M. Steinthal & Co.*, 455 F.2d at 1305 (quoted in *Latecoere Int'l, Inc. v. United States Dep't of the Navy*, 19 F.3d 1342, 1356 (11th Cir.1994)). Hence, "[t]he deference owed to an expert tribunal cannot be allowed to slip into a judicial inertia which results in the unauthorized assumption by an agency of major policy decisions properly made by Congress." *American Ship Building Co. v. National Labor Relations Board*, 380 U.S. 300, 318, 85 S.Ct. 955, 967 , 13 L.Ed.2d 855 (1965).

■ With these precepts in mind, the court turns to the underlying merits of the case and the determination of whether the plaintiff is likely to prevail at trial. Here, the plaintiff proceeds under the second prong of the *Kinnett Dairies, Inc.* analysis, *supra*, arguing that the terms of the Solicitation hindered fair and equal competition in clear and prejudicial violation of the Competition in Contracting Act, 10 U.S.C. § 2304(a)(1)(A).[13] Under this prong, the plaintiff has a heavy burden of showing a "clear illegality." *Sea–Land Service, Inc. v. Brown*, 600 F.2d 429, 434 (3d Cir.1979).

The plaintiff's argument can be summarized as follows: The decision that the terms of the Solicitation are clear and unambiguous and do not require bidders to insert as the unit price on CLIN 0002 the disposal fee in effect at the Escambia County, Florida landfill deprived the plaintiff the opportunity to compete on a "level playing field." H'rg on Pl.'s Mot.Prelim.Inj., Transcript at 106. In other words, the plaintiff argues that a reasonable interpretation of the Solicitation,

---

**13.** The court notes that a finding of clear illegality necessarily renders the Navy's decision arbitrary and capricious. *See Newport News Shipbuilding and Dry Dock Co. v. United States Dep't of Navy*, 771 F.Supp. 739, 742 (E.D.Va.1991), *rev'd on other grounds*, 960 F.2d 386 (4th Cir. 1992).

when read as a whole, required bidders for CLIN 0002 to use the rate in effect at the Escambia County, Florida landfill, which was $30.00 per ton. Alternatively, the plaintiff contends that the terms of the Solicitation pertaining to CLIN 0002 are so ambiguous as to render the Solicitation defective and to prohibit fair and equal competition in the bidding process. *Id.* at 5, 7, 9. The Navy, on the other hand, emphasizes that nowhere in the Solicitation is an express requirement that the unit price be based upon any landfill, much less the Escambia County, Florida landfill.

In alleging a clear violation of the law, the plaintiff points to the provisions of the Competition in Contracting Act (hereafter "CICA"), 10 U.S.C. § 2304(a)(1)(A), which require the head of a United States agency in procuring government contracts to develop specifications and solicit bids through "full and open competition." [14] Moreover, the federal regulations provide that in sealed bidding, as here, the Solicitation "must describe the requirements of the government clearly, accurately, and completely." 48 C.F.R. § 14.101(a).

In determining whether the procurement official acted illegally, the court examines the GAO and the Navy's rationale for awarding the contract to BFI. At the hearing held on January 25, 1995, the Navy argued strenuously that the reference to the Escambia County Commissioners in the Economic Price Adjustment Clause simply provides an objective criterium for controlling reimbursement for price increases at an out-of-county landfill. *See* H'rg on Pl.'s Mot.Prelim.Inj., Transcript at 88–89. Hence, the Economic Price Adjustment Clause serves as a "benchmark" to limit a price increase payable to the contractor and, thus, protects the Navy from "doubling" its costs. *Id.*

Upon the court's remand to the GAO, the GAO adopted and embraced this "benchmark" theory apparently for the first time:

The reference in the IFB to "Escambia County" does not make the solicitation ambiguous. The IFB [Invitation for Bids] contemplated the award of a fixed-price contract with an economic price adjustment provision limited to adjustments in the disposal fees charged by the contractor. This type of contract provides for an upward or downward revision of the stated contract price upon the occurrence of a specified contingency, usually outside the control of the contractor. *See* Federal Acquisition Regulation (FAR) § 16.203. Here, section I.7 of the IFB provides for adjustments to the disposal fee as bid for CLIN 0002, based upon the contingency that an increase or decrease of the landfill/disposal fees set by the Escambia County Commissioners would have an effect on the CLIN 0002 unit price. Thus, a bid and resulting contract based on use of the Escambia County landfill would be subject to this provision.

This clause, however, imposed no restrictions or obligations on how bidders could prepare their bids. It simply identified what contingency outside the control of the contractor could trigger an adjustment to the contract price bid for CLIN 0002.

GAO's March 6, 1995 Resp. to Ct. Order at 3 (brackets supplied).

While the court is not particularly persuaded by the "benchmark" theory, which appears to be an after-thought, the court recognizes that the theory is palatable and apparently serves a bona fide purpose. The court notes, however, that applying the "benchmark" theory to price adjustments for a unit price based upon an out-of-county landfill requires an exercise of arithmetical gymnastics. Through considerable study and exhaustive examination of the record, the court has strived to decipher the complicated logistics of the "benchmark" theory, which is nowhere explained in the Solicitation: [15]

---

**14.** At least one court has found that a bidder for a government contract has a "basic right to be treated fairly in the contracting process." *Dynalectron Corp. v. United States,* 659 F.Supp. 64, 69 (D.D.C.1987).

**15.** At the outset, the court notes that when a bidder uses the disposal fee in effect at the Escambia County, Florida landfill, the application of the "benchmark" theory is clear, simple and straightforward. The Navy always will reimburse actual costs to a bidder using this landfill. In other words, a rise or fall of the disposal fee at

First, the Navy will reimburse a contractor for actual costs incurred from disposing solid waste at an out-of-county landfill as long as the actual cost per ton is equal to or less than the unit price bid by the contractor. For example, upon presentation of receipts from the landfill, BFI can receive renumeration for disposal fee expenses but only up to the amount of its unit price on CLIN 0002, which is $28 per ton. In other words, if the refuse disposal fee at the landfill used by BFI decreases to $15 per ton, it can receive reimbursement only for that amount, not the $28 per ton unit price inserted on CLIN 0002.

In essence, the "benchmark" theory only comes into play when an out-of-county landfill raises its refuse disposal fee. In order for the contractor to recoup expenses in excess of its CLIN 0002 unit price, two events must occur somewhat simultaneously: First, the disposal fee price increase at the out-of-county landfill must exceed the unit price inserted on CLIN 0002. Second, the disposal fee at the Escambia County landfill must increase. Even if these two contingencies occur, a price adjustment is not guaranteed.

This concept can best be explained by illustration: If the out-of-county landfill used by BFI raises its disposal fee to $31 per ton ($3 above BFI's unit price of $28 per ton) and the rate charged at the Escambia County landfill increases by $2 per ton, then the Economic Price Adjustment Clause allows BFI to recoup an additional $2 per ton. In other words, the Navy would compensate BFI $30 for every ton of solid waste of which it disposed at the out-of-county landfill, but BFI would have to absorb the other $1 per ton increase. If, however, the Escambia

County Commissioners did not increase the disposal fee at the county landfill, then BFI could not recapture any expenses incurred from a price increase at the out-of-county landfill.[16]

As illustrated, the objective criterium for determining price adjustments is mathematically calculable (albeit very confusing). However, the "benchmark" theory, when considered in conjunction with other factors in this case, causes great concern to the court. For example, from aught that appears, the GAO's adoption of the "benchmark" theory is an endeavor to explain away its own confusion (the very same confusion voiced by the plaintiff) about the reference to the Escambia County Commissioners in the Economic Price Adjustment Clause.

The court is alluding to the following quotation of a telefax, bearing the letterhead of the Office of Counsel Naval Facilities Engineering Command, "From: Diane Hayden," "To: Jim Sparks," "Subj: Dunning (our favorite case)," dated November 11, 1994: "The GAO atty called—He has concerns over the [Economic Price Adjustment] clause— see attached. Why did we reference Escambia County landfill[?] Will talk to you on Mon. re: this issue. Very Important!" *See* Ct.'s *Memorandum Opinion and Order*, Jan. 31, 1995, Ct.'s Ex. 2 attached thereto (brackets supplied).

The court invited the GAO to address whether this "very important" concern goes to the core issue of whether the terms of the Solicitation are clear and promoted full and open competition. The GAO responded that the GAO attorney (the very one who was

---

the Escambia County, Florida landfill will represent the exact price adjustment received by the bidder. In fact, the Navy would have no reason to argue the "benchmark" theory if all bidders were required to haul the waste to the county landfill. Hence, the following discussion focuses on the formula for determining when a contractor, who uses an out-of-county landfill, may receive reimbursement from the Navy for a price adjustment.

**16.** The Solicitation's Economic Price Adjustment Clause requires a contractor to notify the contracting officer when a change in the disposal fee set by the Escambia County Commissioners causes the unit price for CLIN 0002 to either

decrease or increase. The court simply comments that both the Navy and the GAO failed to (or cannot) explain how the "benchmark" theory operates when applied to disposal fee decreases at the Escambia County, Florida landfill, which affect a contractor's unit price on CLIN 0002.

The court can hypothesize that if there were a decrease in the disposal fee set by the Escambia County Commissioners, thereby causing the unit price for CLIN 0002 to decrease, then the Navy would adjust the contractor's price upward. This contingency, however, was nowhere suggested or argued at the hearing on the preliminary injunction or in brief and is nowhere explained in the Solicitation.

drafting the protest decision) simply was trying to determine

> ... whether supplemental submissions should be required concerning the reference to Escambia County. After careful consideration, [the GAO] concluded that the clause pertained solely to contract administration, a matter which [it does] not review. Since the protester did not specifically question the clause, and since it would not have been dispositive of the issue presented in the protest, no further submissions were required from the parties.

GAO's March 6, 1995 Resp. to Ct.'s Order at 4 (brackets supplied).

The court finds this explanation specious and unpersuasive. While a bidder's compliance with the Economic Price Adjustment Clause, and the Solicitation as a whole, is a matter of contract administration, the GAO's response tip toes around the more-than-obvious apprehensions of the GAO. Significantly, this *ex parte* communication occurred after the plaintiff filed its protest but before the GAO issued its decision denying the protest. In fact, the Navy essentially concedes that the drafters of the Solicitation probably never anticipated that any bidder would select a landfill outside Escambia County, Florida. H'rg on Pl.'s Mot.Prelim.Inj., Transcript at 37.

Of particular significance to the court is the Escambia County Ordinance, which requires all waste generated within the county to be disposed of in the county landfill. The

plaintiff argues that the local ordinance, when read in conjunction with certain provisions of the Solicitation, required bidders to insert as the unit price the disposal fee in effect at the Escambia County, Florida landfill on October 1, 1994, which was $30 per ton, *See* Pl.'s Verified Compl., Ex. 6 attached thereto (Pl.'s Protest to the GAO).

The Navy, on the other hand, asserts that the local ordinance has no bearing on the bidders' choice of landfill used to determine the unit price on CLIN 0002. In particular, the Navy argues that the local ordinance is inapplicable to the Navy, since Congress has not waived sovereign immunity as to the subject matter and that in light of recent court decisions, the ordinance is unconstitutional and, thus, unenforceable. The court quickly rejects the GAO's first assertion, as the Resource Conservation and Recovery Act (hereafter "RCRA"), 42 U.S.C. § 6961, constitutes a waiver of sovereign immunity; [17] *see also Parola v. Weinberger,* 848 F.2d 956, 960 (9th Cir.1988) (stating that the RCRA "unambiguously subjects federal instrumentalities to state and local regulation").[18]

While BFI and the Navy cite a panoply of cases, wherein the courts have ruled that similar ordinances violate the Commerce Clause, no authority has been cited and the court's independent research has found no authority indicating that the Escambia County Ordinance has been overturned or even challenged. The court, however, need not indulge in a discussion of the constitutionality *vel non* of such an ordinance as that issue is not before the court.[19] All that need be said

---

**17.** 42 U.S.C. § 6961 provides as follows:

Each department, agency, and instrumentality of the executive, legislative, and judicial branches of the Federal Government ... engaged in any activity resulting, or which may result, in the disposal or management of solid waste or hazardous waste shall be subject to, and comply with, all Federal, State, interstate and *local requirements, both substantive and procedural* (*including any requirements for permits* or reporting or any provisions for injunctive relief and such sanctions as may be imposed by a court to enforce such relief), respecting control and abatement of solid waste or hazardous waste disposal and management in the same manner, and to the same extent, as any person is subject to such requirements, including the payment of reasonable service charges.... The President may exempt any

solid waste management facility of any department, agency, or instrumentality in the executive branch from compliance with such a requirement if he determines it to be in the paramount interest of the United States to do so. (Emphasis supplied.)

**18.** The court does not cite this case for the proposition; as does the plaintiff, that the Escambia County Ordinance would withstand constitutional scrutiny, as that issue is not before the court, discussed *infra.*

**19.** One of the cases cited by the Navy is *Waste Recycling, Inc. v. Southeast Alabama Solid Waste Disposal Auth.,* 814 F.Supp. 1566 (M.D.Ala.1993) (Thompson, J.), *aff'd,* 29 F.3d 641 (11th Cir. 1994), wherein the court found that certain counties and cities, including Dothan, Alabama,

is that when the bidders prepared their bids and even today, the ordinance was and is in full force and effect. It states the obvious that until a court rules upon the constitutionality of the ordinance or until its repeal, the law is the law, good or bad.

The GAO also states that whether BFI "intends to comply with the local ordinance, or enter into a franchise agreement with the county ... is not for [its] consideration." While the court agrees that enforcement of the terms of the Solicitation is within the contracting officer's jurisdiction, this response evades the real question. Rather, the GAO should have considered whether the local ordinance, which requires the use of the Escambia County, Florida landfill, contributed to the confusion among the bidders when studying the Solicitation, thus rendering the terms thereof so ambiguous as to impede full and open competition in the bidding process.[20]

The logical conclusion is that the plaintiff, as well as *all* bidders except BFI, were misled or at least confused. This inference is bolstered by the fact that apparently *all* but one bidder and except BFI, bid the disposal fee in effect at the Escambia County, Florida landfill.[21] Moreover, at least one bidder examined the local ordinance, which contributed in part to its determination that the contract required hauling waste to the Escambia County, Florida landfill. *See* Vincent R. Crawford's Aff. at ¶¶ 8, 9.

In addition, the GAO even admits that the Navy "might have envisioned that its contractor would be required by local laws to use the Escambia County[, Florida] landfill." GAO's March 6, 1995 Resp. to Ct.'s Order at 4 (brackets supplied). If the Navy, which drafted the Solicitation, may have "envisioned" the use of the Escambia County, Florida landfill, it certainly is conceivable that a bidder would reach the same conclusion. Additionally, the court finds it ironic that the GAO, the governmental agency entrusted to administer and follow federal regulations, would place a stamp of approval on a solicitation interpretation that effectively allows a bidder to violate the law.

As a final matter, the court will address the plaintiff's contention that the provisions of the Solicitation mandated compliance with all laws, including the Escambia County Ordinance at issue. As to these provisions, the GAO offers the following explanation: "Where, as here, a solicitation contains only a general requirement that the contractor comply with applicable laws, the prospective contractor—not federal government officials—is responsible for determining what the state or local requirements may be." *Mark Dunning Indus., Inc.,* B–258373 slip op. at 5 (Dec. 7, 1994) (citation omitted). In support thereof, the GAO cites government procurement law for the proposition that

> [a]lthough a contracting officer may determine that the absence of an appropriate

---

violated the Commerce Clause by requiring disposal of solid waste in government-owned landfills.

The court notes that even if the constitutionality of the Escambia County Ordinance were at issue in this case, the district court's opinion is not, as the Navy asserts, binding on this court. *See* Def.s' Resp. in Opp. to Pl.'s Mot. Prelim. Inj., Jan. 25, 1995, at 4. While stare decisis requires this court to follow decisions of the Court of Appeals for the Eleventh Circuit, a trial court's opinion is persuasive primary authority, not mandatory.

**20.** Answering that question is completely within the jurisdiction of the GAO. *See P.J. Dick, Inc.,* B–259166, B–26033, slip op. (March 6, 1995). There, the GAO was called upon to determine whether the terms of the solicitation were ambiguous:

> Because of the potential adverse impact on the competitive bidding system of canceling an IFB after prices have been exposed, any can-

cellation after bid opening must be based on a compelling reason. A compelling reason to cancel a solicitation exists where material solicitation terms are ambiguous or in conflict. Contracting officials have broad discretion to determine whether appropriate circumstances for cancellation exist, and our review is limited to considering the reasonableness of their decisions. Here, we conclude that the agency had a compelling reason to cancel the IFB because the solicitation was misleading and contained conflicting terms.

*Id.* (internal citations omitted).

**21.** One of the bidders for the disputed procurement bid a landfill rate of $31.50, which is 5% higher than the disposal fee at the Escambia County, Florida landfill. Notably, this additional 5% is exactly equal to the franchise fee charged by the county on these landfill fees. *See* Hr'g on Pl.'s Mot. Prelim. Inj., Transcript at 61–62.

business license, or, as allegedly required here, a "franchise agreement," renders a bidder nonresponsible, compliance with state or local requirements is generally a matter between the contractor and the issuing authority, and will not be a bar to contract award absent a specific requirement in the solicitation.

*Id.* at 5–6 (citation omitted) (internal footnote omitted).

■ With all respect for the common law of government procurement, the court finds that the GAO cannot rely on principles of procurement law, even well-established ones, when reliance is inconsistent with federal statutes and regulations. In other words, the GAO cannot circumvent the court's finding, *infra,* that the confusing and ambiguous terms of the Solicitation impede full and open competition in violation of the CICA and fail to "describe the requirements of the government clearly, accurately, and completely." 48 C.F.R. § 14.101(a). The GAO also may not bypass the RCRA, *see* footnote 17, which mandates compliance with all "local requirements, both substantive and procedural (including any requirements for permits[ ) ]." Hence, the directives of the statute and federal regulation trump the GAO's dependence upon government procurement law.

When viewing all the factors as a whole—the perplexing "benchmark" theory, the GAO's apparent confusion about the reference in the Solicitation to the Escambia County Commissioners, the Escambia County local ordinance and the fact that all bidders (except BFI) inserted on CLIN 0002 the exact disposal fee in effect at the Escambia County, Florida landfill [22]—the court has no difficulty finding a clear violation of the CICA, which requires full and open competition in the procurement of government contracts, and the federal regulation mandating that the terms of the Solicitation be clear, accurate and complete.

■ As already stated, the plaintiff has the burden of showing not only a clear violation of the law but also a prejudicial violation. *Elcon Enterprises, Inc. v. Washington Metro. Area Transit Auth.,* 977 F.2d 1472, 1478 (D.C.Cir.1992). The plaintiff can establish prejudice by showing a considerable probability that had the terms of the Solicitation been clear and unambiguous, the plaintiff would have been the low bidder and received the award of the contract. *Choctaw Mfg. Co., Inc.,* 761 F.2d at 620. Here, the price differential between the plaintiff and BFI's amount for CLIN 0002 totalled more than $28,000, while BFI's overall bid was only $12,000 less than the plaintiff's. Hence, the two dollar variation between the plaintiff's unit price on CLIN 0002 and BFI's determined to whom the Navy awarded the contract.

The plaintiff testified at the hearing and by affidavit that if it had known that bidders could base the unit price on a landfill other than the Escambia County, Florida landfill, it would have inserted a lower unit price on CLIN 0002, which would have resulted in the plaintiff being the low bidder. *See* H'rg on Pl.'s Mot.Prelim.Inj., Transcript at 99–100. Based upon this evidence, the plaintiff has convinced the court that the ambiguous terms of the Solicitation caused the plaintiff substantial prejudice. Accordingly, the court finds that the plaintiff has shown a probability of success on the merits.[23]

## B. Irreparable Injury

■ The party moving for preliminary injunctive relief also must show irreparable injury. If the damages are calculable in money, then the injury is not irreparable. *Collins & Co., General Contractors, Inc. v. Claytor,* 476 F.Supp. 407, 410 (N.D.Ga.1979) (stating that "the principal and overriding element of this prerequisite is irreparable harm resulting from the absence of an adequate remedy at law") (citations omitted). Hence, the doctrine that the legal remedy must be inadequate before equity will act is

---

22. The sole exception is the lone bidder who added 50 cents thereto, which is the exact amount of the franchise tax per ton. *See* footnote 21.

23. In so finding, the court need not address the plaintiff's argument that the terms of the Solicitation required the bidder to insert for the unit price on CLIN 0002 the "exact" disposal fee in effect at the Escambia County, Florida landfill, as that issue does not affect the *ratio decidendi.*

inextricably intertwined with the irreparable injury element.

■ Here, the court finds that the plaintiff lacks an adequate remedy at law. The plaintiff's only alternative to injunctive relief is an action for money damages in the United States Court of Claims. *See generally Keco Indus., Inc. v. United States,* 428 F.2d 1233, 192 Ct.Cl. 773 (1970). Courts have found that generally monetary relief, i.e., recovery of bid preparation costs, is insufficient to compensate an unsuccessful bidder for the wrongful award of a government procurement contract:

> It is the plaintiff's assertion that those damages [bid preparation costs] are clearly inadequate, since they may not include the loss of profits that the plaintiff would have made on this more than two million dollar contract had it been awarded the contract in question. The court agrees. *See Ainslie Corp. v. Middendorf,* 381 F.Supp. 305, 307 (D.Mass.1974). The federal courts have recognized the inadequacy of the Court of Claims remedy. In *General Electric Co. v. Seamans,* 340 F.Supp. 636 (D.D.C.1972), the court held that the action for damages in the Court of Claims was an inadequate remedy because it did not fully compensate the loss sustained by the frustrated bidder. While recognizing authority to the contrary, this court finds that the Fifth Circuit takes the position that in an appropriate case equitable relief to an aggrieved bidder is proper. *Kinnett Dairies, Inc. v. Farrow,* 580 F.2d 1260 (5th Cir. 1978); *Hayes International Corp. v. McLucas,* 509 F.2d 247 (5th Cir.1975).[24] The court believes the instant case to be appropriate for injunctive relief....

*Collins & Co., General Contractors, Inc.,* 476 F.Supp. at 410 (citations omitted) (footnote supplied) (brackets supplied).

■ Moreover, the court finds that the right to fair and equal competition in bidding for government procurement contracts is a statutory right, which can be adequately protected only by the issuance of injunctive relief. In granting injunctive relief to a disappointed bidder, the Federal Circuit explained:

> The injury CACI [the disappointed bidder] here asserts is that the government's breach of its implied contract to deal fairly with all bidders denied CACI the opportunity to have its bid considered solely on its merits. An injunction barring the award would correct this alleged injury since it would require the government, if it wants to go ahead with the procurement, to repeat the bidding process under circumstances that would eliminate the alleged taint of prior proceedings.

*National Maritime Union of America v. Commander, Military Sealift Command,* 824 F.2d 1228, 1237 (D.C.Cir.1987) (citation omitted). Similarly, in *Georgia Gazette Publishing Co.,* the court found that in soliciting bids for the publication of a civilian enterprise newspaper, the United States Department of the Army deprived the unsuccessful bidder "... of its opportunity to have its proposal fairly and equally considered. This injury is not monetarily compensable. Plaintiff has suffered irreparable harm through denial of this opportunity." 562 F.Supp. at 1010.

Moreover, the loss of the plaintiff's status as the incumbent contractor will result in irreparable injury if a preliminary injunction does not issue. The plaintiff's bid prices for the contract at issue are premised upon an uninterrupted transition from the incumbent contract to the new contract. If after a trial on the merits, the trier of fact determines that the Solicitation should be rebid, the plaintiff will have lost its advantage as the incumbent contractor. Without this injunction, the Navy will force the plaintiff to demobilize from the contract site, lay off its workers and dispose of its equipment. When rebidding this work, the plaintiff will necessarily have to include the cost of hiring and retraining employees. Accordingly, the court finds that a preliminary injunction is necessary to preserve the status quo pending trial because otherwise irreparable harm to the plaintiff will result.

**24.** Certiorari denied by *Hayes Int'l Corp. v. McLucas,* 423 U.S. 864, 96 S.Ct. 123, 46 L.Ed.2d 92 (1975).

### C. Plaintiff's Irreparable Injury Outweighs Any Harm to the Interested Parties

■ Moreover, the court finds that the granting of a preliminary injunction will not substantially endanger the interests of the Navy or BFI. First, the plaintiff is more than willing to continue collecting and disposing of the solid waste at the Pensacola, Florida Naval Air Station; hence, the Navy will not have to forego any necessary services under the contract. *See Serv–Air, Inc. v. Seamans,* 473 F.2d 158 (D.C.Cir.1972); *Universal Shipping Co., Inc. v. United States,* 652 F.Supp. 668 (D.D.C.1987). Second, the court finds that the interests of the public and all those who bid for government procurement contracts, as well as the Navy's compliance with the statute and regulation, outweigh any extra costs incurred by the Navy or BFI as result of the preliminary injunction. *See Choctaw Mfg. Co., Inc.,* 761 F.2d at 621.

### D. Public Interest

■ The public interest factor is an elusive one in that opposing parties generally can make reasonable arguments that the public interest favors each side of the dispute. Here, however, the court finds that the public interest in maintaining the integrity of the procurement process and ensuring fair and open competition outweighs the public interest in avoiding disruption of the procurement process. *See City of Rochester v. United States Environmental Protection Agency,* 496 F.Supp. 751 (D.Minn.1980). Ultimately, exact conformance with the bidding procedures as promulgated in federal statutes and procurement regulations will best serve the public interest. *See Choctaw Mfg. Co., Inc.,* 761 F.2d at 618–619 n. 17. This public interest and the plaintiff's right to assert that interest are well settled.

Accordingly, the court finds that the public's right to have government contracts solicited in accordance with the procurement statutes and regulations outweighs any administrative inconvenience or additional cost to the Navy or BFI.

### E. Bond

■ Rule 65(c) of the *Federal Rules of Civil Procedure* provides that

[n]o restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

The amount of the bond is within the sole discretion of the trial judge. *See System Operations, Inc. v. Scientific Games Dev. Corp.,* 555 F.2d 1131 (3d Cir.1977) (stating that although the trial judge has substantial discretion in setting the amount of the bond, it is reversible error to refuse a bond unless there is no risk of monetary loss).

Here, the court finds that the plaintiff should post a security bond. Based upon the plaintiff's likelihood of success on the merits, the court finds that the plaintiff shall post a properly conditioned security bond in the amount of $50,000 to compensate any losses the Navy and/or BFI may incur if wrongfully enjoined.

### CONCLUSION

Accordingly and for the foregoing reasons, the court finds that the plaintiff's motion for a preliminary injunction is due to be granted. An order in accordance with this memorandum opinion shall be entered separately.

### *PRELIMINARY INJUNCTION*

In accordance with the attached memorandum opinion and Rule 65(d) of the *Federal Rules of Civil Procedure,* it is CONSIDERED and ORDERED that plaintiff Mark Dunning Industries, Inc.'s motion for preliminary injunction be and the same is hereby GRANTED pending a final adjudication of the case on the merits and that the defendants William J. Perry, Secretary of Defense; John H. Dalton, Secretary of the Navy; B.J. Anderson, Contracting Officer; their officers, agents, servants, employees and attorneys and all other persons in active concert or participation with them who receive actual notice of this preliminary injunc-

tion be and they are hereby PRELIMINARILY ENJOINED from placing into effect the United States Department of the Navy's contract heretofore awarded to Browning Ferris Industries of Florida, Inc. pursuant to Bid Solicitation No. N65114.

It is further CONSIDERED and ORDERED that plaintiff Mark Dunning Industries, Inc., with its consent, continue performance of the refuse collection and removal at the Pensacola, Florida Naval Air Station pending a final disposition of this litigation.

It is further CONSIDERED and ORDERED that the plaintiff post a security bond with the clerk of the court in the amount of $50,000, conditioned as provided by law.

### APPENDIX

### ORDINANCE NO. 92–28

AN ORDINANCE RELATING TO ESCAMBIA COUNTY, FLORIDA, REQUIRING FRANCHISES FOR CERTAIN NON–RESIDENTIAL SOLID WASTE COLLECTION AND DISPOSAL ACTIVITIES; PROVIDING TERMS AND CONDITIONS FOR FRANCHISES; PROVIDING METHOD OF DEFAULT OR TERMINATION; PROVIDING FOR APPEAL TO DEFAULT OR TERMINATION; PROVIDING FOR SEVERABILITY; PROVIDING FOR AN EFFECTIVE DATE.

Whereas, Escambia County finds it in the public interest to ensure that all unincorporated areas within its jurisdictional boundaries are adequately provided with high-quality, reliable non-residential solid waste collection and disposal service; and

Whereas, Escambia County, in the interest of public health, safety and general welfare and to be in compliance with certain provisions of the State of Florida's Growth Management Act, F.S. 163, does hereby determine that it is necessary to exert regulatory control over non-residential solid waste collection and disposal to the extent allowed by law; and

Whereas, Escambia County has a responsibility to retain control over the use of public rights-of-way by solid waste collectors to ensure against interference with public convenience, to promote aesthetic considerations, and to protect the public's investment; and

Whereas, Escambia County finds it necessary to ensure that high-quality non-residential solid waste collection and disposal service is maintained through a responsive complaint handling procedure; and

Whereas, Escambia County finds that the granting and issuance of non-exclusive franchises for the collection and disposal of nonresidential solid waste is the best means of assuring the above described interests of Escambia County are promoted;

NOW, THEREFORE, BE IT ORDAINED BY ESCAMBIA COUNTY, FLORIDA

Section 1.  Franchise Required; Exception.

It shall be unlawful for any person, firm or entity to engage in the business of collecting and disposing of non-residential solid waste generated by any other person, firm or entity without having been granted a franchise by the County. Provided, however, nothing in this section shall be construed to require any generator of non-residential solid waste upon premises belonging to himself or itself from removing and disposing of such non-residential solid waste without first obtaining a franchise. All such removal, transporting and disposal of owner generated non-residential solid waste shall be transported and disposed of in the manner specified in applicable Escambia County Ordinances.

Section 2.  Providing Term and Conditions For Franchise.

Said franchise for the collection and disposal of non-residential solid waste shall be for the period specified in the Franchise Agreement unless otherwise terminated.

Collector is required to possess a Certificate of Need and a valid Solid Waste Management Permit as required by Escambia County Ordinance 85–7 or other applicable ordinances. Upon receipt of a properly executed franchise agreement, collector shall abide by all requirements of said agreement as written on the date of execution and to any amendments as may be imposed from time to

time as a condition to the granting of a franchise.

Section 3. Providing Method of Default or Termination.

The franchise agreement is subject to default or termination under certain conditions as outlined in the agreement.

Section 4. Providing For Appeal to Default or Termination.

Collector has certain rights of appeal on an action to default or terminate this agreement as outlined in the agreement.

Section 5. Providing For Severability.

Said franchise agreement outlines the method of severability for one or more of the provisions contained within the agreement.

Section 6. Providing For an Effective Date.

In accordance with Section 125.66(2), Florida Statutes, a certified copy of this ordinance shall be filed with the Department of State by the Clerk of the Board of County Commissioners within ten (10) days after enactment by said Board and shall take effect upon receipt of official acknowledgement from that office that said ordinance has been filed.

> BOARD OF COUNTY COMMISSIONERS
> ESCAMBIA COUNTY, FLORIDA
> W.A. "Buck" Lee
> W.A. "BUCK" LEE, CHAIRMAN

ATTEST: JOE A. FLOWERS

> COMPTROLLER

BY: Joe A. Flowers

> CLERK

(SEAL)

ADOPTED: AUGUST 4, 1992